Billy Joe BATTIE, Petitioner-Appellant,

v.

W. J. ESTELLE, Jr., Director, Texas
Department of Corrections, et al.,
Respondents-Appellees.

No. 79–1567.

United States Court of Appeals,
Fifth Circuit.

Sept. 11, 1981.

694

Joe James Sawyer, Colorado Springs, Colo. (Court-appointed), for petitioner-appellant.

Joel Berger, New York City, amicus curiae, for NAACP Legal Defense and Educational Fund.

Anthony G. Amsterdam, Stanford Univ. Law School, Stanford, Cal., amicus curiae.

Leslie Benitez, Asst. Atty. Gen., Austin, Tex., for respondents-appellees.

Before AINSWORTH and HENDERSON, Circuit Judges, and HUNTER *, District Judge.

AINSWORTH, Circuit Judge:

Billy Joe Battie, a Texas state prisoner under sentence of death, has appealed the district court's denial of his petition for a writ of habeas corpus. On appeal, petitioner raises only three of the numerous claims originally presented in his petition.[1] Each ground challenges only petitioner's sentence of death and not his conviction. We withheld our decision in this case pending the decision of the Supreme Court of the United States in *Estelle v. Smith*, —— U.S. ——, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). We hold, in light of *Smith*, that one of his claims has merit, and reverse the district court.[2]

## I. Statement of the Case

### A. Facts of the Crimes

The evidence introduced at petitioner's trial demonstrated that he murdered a store attendant, Peggy Hester, and a customer,

---

* District Judge of the Western District of Louisiana, sitting by designation.

1. In his habeas petition, Battie also raised the following grounds for relief: (1) his death sentence is disproportionate in light of all the facts and circumstances of his life, character, and record; (2) the Texas capital punishment statutes failed to permit the jury to consider the mitigating circumstances present in his case; (3) capital punishment is inherently unconstitutional; (4) the Texas capital sentencing procedures have been applied since 1973 in an arbitrary and capricious fashion, as well as in a manner discriminating on the basis of race, sex, and wealth; (5) the manner of execution in Texas, lethal injection, constitutes cruel and unusual punishment; (6) his right to voir dire the jury was impaired; (7) the trial court expanded the oath required of jurors; and (8) the excusal for cause of veniremen who stated that they would automatically vote against capital punishment violated his right to an impartial jury, to a jury representative of the community, and to a jury reflecting contemporary standards of decency. Petitioner has not pursued these issues on appeal and has therefore abandoned them. *Tyler v. Phelps*, 643 F.2d 1095, 1098 n. 2 (5th Cir. 1981); *Mayberry v. Davis*, 608 F.2d 1070, 1071–72 (5th Cir. 1979). *See Coco v. United States*, 569 F.2d 367, 369–71 (5th Cir. 1978); *Rodriguez v. Estelle*, 536 F.2d

1096, 1097 (5th Cir. 1976). In addition, several of these issues have already been resolved adversely to the contentions of petitioner. *Spinkellink v. Wainwright*, 578 F.2d 582 (5th Cir. 1978), *cert. denied*, 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979).

2. Battie also contends that the admission of Dr. Patterson's testimony violated his sixth amendment right to counsel under *Estelle v. Smith*, —— U.S. ——, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) and *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), as well as the due process clause of the fourteenth amendment because psychological testimony predicting future dangerousness is unconstitutionally unreliable. *See* Westen, *The Future of Confrontation*, 77 Mich.L.Rev. 1185, 1190 (1979) (while the due process clause does set a threshold standard of reliability, "only the most tendentious and inherently dubious items of evidence are deemed to run afoul of the due process clause. In the Supreme Court's language the due process clause bars evidence only if there is ' "a very substantial likelihood" ' that it is false.") Because we find that Battie's sentence must be vacated on the basis of his fifth amendment argument, we do not address his other challenges to his sentence.

John Howard Robinson, during the course of a robbery of a convenience store. On the night of January 13, 1975, Battie entered the In-N-Out Food Store in Fort Worth, Texas, armed with a .410 shotgun along with two accomplices, Artimus Mayfield and Leon Turner. While in the store, Battie trained the shotgun on Hester and Robinson and ordered them to stand against a rear wall of the store while Turner emptied the cash register. After the robbery had been completed, Battie executed both Hester and Robinson with shotgun blasts from point-blank range. Robinson was shot once, Hester twice, and her body was found with her hands clasped together as though begging for her life. All three felons escaped without being seen by any witnesses. Battie was arrested a few days later on an unrelated charge, and sent a note to the police while in custody stating that he "knew something" about the murders. Posing as a witness to the murders, Battie initially implicated someone else as responsible, but ultimately confessed to committing the murders himself.[3]

### B. State Court Proceedings

Battie was tried for capital murder in Tarrant County, Texas, state court. Prior to trial, Battie's defense counsel filed a motion for a psychiatric examination of the petitioner to determine whether he was competent to stand trial and whether he was insane at the time of the crime. The state trial court granted the defense motion and appointed Dr. Harold B. Eudaly, a psychiatrist, and Dr. Howard Patterson, a clinical psychologist, to examine the petitioner.

Dr. Eudaly concluded that the petitioner was not suffering from any psychotic or severe psychoneurotic mental disorder, and submitted a copy of his report to that effect to the state trial judge, but he did not testify at petitioner's trial for either the state or the defense. Dr. Patterson conducted a standard battery of psychological tests on Battie and submitted his report of those test findings to Dr. Eudaly. At the time he conducted the psychological testing of petitioner, Dr. Patterson was unaware of petitioner's background and the facts surrounding the crime charged against petitioner. The tests Dr. Patterson administered did not elicit any facts regarding the crime, and Dr. Patterson did not interrogate Battie about the murders. Instead, Dr. Patterson based his diagnostic evaluation of petitioner entirely upon the results of the tests given Battie. From his testing of petitioner, Dr. Patterson concluded that petitioner was suffering from a sociopathic personality disorder. Dr. Patterson was not called as a witness by either the State or the defense to testify regarding either petitioner's competency to stand trial or sanity at the time of the murders, but was called by the State to testify at the penalty stage of petitioner's trial.[4] On the basis of the test results, he testified that petitioner was a sociopath and therefore, because of the likelihood that a sociopath would continue to follow a violent career, petitioner was likely to commit criminal acts of violence that would constitute a continuing threat to society.[5] This testimony forms the basis of petitioner's challenge to his sentence in this case.

---

3. Petitioner has not challenged either the accuracy or the admissibility of his confession in these federal habeas proceedings.

4. The Texas capital sentencing procedure is discussed in *Estelle v. Smith*, —— U.S. ——, —————— & nn. 2 & 3, 101 S.Ct. 1866, 1870 & nn. 2 & 3, 68 L.Ed.2d 359 (1981) and *Jurek v. Texas*, 428 U.S. 262, 267–69 & n. 5, 96 S.Ct. 2950, 2954–55, n. 5, 49 L.Ed.2d 929 (1976) (opinion of Stewart, Powell & Stevens, JJ.).

5. Texas law requires the State to prove beyond a reasonable doubt that "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex.Code Crim.Pro. Art.

37.071(b)(2) (Vernon Supp. 1980). The Supreme Court upheld the constitutionality of this statute over the objection that the prediction of future dangerousness was impossible in *Jurek v. Texas*, 428 U.S. 262, 274–76, 96 S.Ct. 2950, 2957–58, 49 L.Ed.2d 929 (1976) (opinion of Stewart, Powell & Stevens, JJ.); *id.* at 278–79, 96 S.Ct. at 2959 (White, J., concurring in the judgment); *see also id.* at 279, 96 S.Ct. at 2960 (Blackmun, J., concurring in the judgment). The Court reaffirmed the constitutionality of this statute in *Estelle v. Smith*, —— U.S. ——, ——, 101 S.Ct. 1866, 1878, 68 L.Ed.2d 359 (1981).

At trial, petitioner was convicted of capital murder and was sentenced to death. He then appealed his conviction and sentence to the Texas Court of Criminal Appeals, which affirmed the judgment of the trial court. *Battie v. State*, 551 S.W.2d 401 (Tex. Crim.App.1977). Battie next petitioned the Supreme Court of the United States for a writ of certiorari, and the Supreme Court declined to review his case. *Battie v. Texas*, 434 U.S. 1041, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978). After the Supreme Court denied his petition, Battie filed his first application for a writ of habeas corpus in state court. This application was denied by the Texas Court of Criminal Appeals. *Ex parte Battie*, No. 56,106 (Tex.Crim.App. Feb. 1, 1978) (per curiam). Battie's execution date was then set for April 7, 1978. On April 3, Battie filed a second application for post-conviction relief in state court, which was ultimately denied on July 14.

## C. Federal Court Proceedings

Battie filed his first federal habeas petition on April 3, 1978 in the District Court for the Northern District of Texas. Judge Eldon B. Mahon granted petitioner a stay of execution but subsequently dismissed his petition without prejudice because of failure to exhaust available state remedies. Following denial of the second state habeas petition, the state trial court reset petitioner's execution for August 25. Battie then filed a second federal habeas petition on August 17 with the same federal district court. Judge Mahon again stayed petitioner's execution and referred the petition to a United States magistrate. Thereafter, the magistrate entered a report containing his factual and legal findings, conclusions, and recommendation that Battie's petition be dismissed. Judge Mahon then adopted the magistrate's report as his own opinion after independently reviewing the record in petitioner's case and dismissed Battie's petition

in accordance with the magistrate's recommendation.

## II. Self-Incrimination Claim

▇▇▇ Petitioner contends that admission of Dr. Patterson's testimony violated his fifth amendment privilege against compelled self-incrimination as interpreted in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and *Estelle v. Smith, supra*, —— U.S. ——, 101 S.Ct. 1866, 68 L.Ed.2d 359, because he was not advised prior to Dr. Patterson's testing that he had the right to remain silent and that, if he gave up that right, anything he said could be used against him in court at a sentencing proceeding.[6] The State argues that the Supreme Court's decision in *Smith* should not be applied retroactively and alternatively that, in any event, admission of Dr. Patterson's testimony did not violate petitioner's fifth amendment privilege. We have been enjoined by the Supreme Court to decide potentially dispositive questions regarding the retroactive application of substantive constitutional doctrine prior to passing on to substantive claims assertedly applying that doctrine to a particular case.[7] Accordingly, we first consider the question of whether the Supreme Court's application of *Miranda* in *Smith* to diagnostic examinations conducted by mental health experts should be given retroactive effect.

### A. Retroactivity of *Estelle v. Smith*

▇▇▇ The constitution does not require that every decision of federal constitutional law be applied retroactively, and a federal court may apply a rule prospectively in certain circumstances. *Brown v. Louisiana*, 447 U.S. 323, 327, 100 S.Ct. 2214, 2219, 65 L.Ed.2d 159 (1980); *Linkletter v. Walker*, 381 U.S. 618, 628–29, 85 S.Ct. 1731, 1737, 14 L.Ed.2d 601 (1965). Whether a decision

---

6. The fifth amendment privilege is applicable to the States through the due process clause of the fourteenth amendment. *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

7. "[T]he district courts and courts of appeals should follow our practice, when issues of both retroactivity and application of constitutional doctrine are raised, of deciding the retroactivity issue first." *Bowen v. United States*, 422 U.S. 916, 920, 95 S.Ct. 2569, 2573, 45 L.Ed.2d 641 (1975).

should be given retroactive or prospective application does not turn on the particular constitutional provision forming the basis for the principle expressed in the decision because " '[e]ach constitutional rule of criminal procedure has its own distinct functions, its own background of precedent, and its own impact on the administration of justice, and the way in which these factors combine must inevitably vary with the dictate involved.' " *Id.* at 327, 100 S.Ct. at 2214, quoting *Johnson v. New Jersey,* 384 U.S. 719, 728, 86 S.Ct. 1772, 1778, 16 L.Ed.2d 882 (1966). Instead, the determination of whether a decision should be accorded retroactive or prospective effect focuses upon a two-part standard. The first part of this test gauges whether the principle in question is new or is simply a restatement of already established principles and the application of those principles to a particular set of facts. A decision establishes a new principle of law "either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed." *Chevron Oil Co. v. Huson,* 404 U.S. 97, 106, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971) (citations omitted); *Caver v. Alabama,* 577 F.2d 1188, 1193 (5th Cir. 1978). Only a decision which establishes a new principle of law need be considered for prospective application. A decision which merely restates existing law or which simply applies already established law to a set of facts different from those which gave birth to the original principle is given retroactive application. *United States v. Ross,* 655 F.2d 1159, 1163 (D.C. Cir. 1981) (en banc). The second part of the test consists of an evaluation of the factors first set out in *Stovall v. Denno,* 388 U.S. 293, 297, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199 (1967): namely, the purpose of the new ruling, the extent to which law enforcement authorities may have relied upon the previous state of the law, and the impact of a retroactive application of the new federal constitutional principle on the administration of justice. Of these three factors, the first is clearly the most important and the others come into play chiefly when " 'the purpose of the rule in question [does]

not clearly favor either retroactivity or prospectivity.' " *Brown v. Louisiana, supra,* 447 U.S. at 328, 100 S.Ct. at 2219, quoting *Desist v. United States,* 394 U.S. 244, 251, 89 S.Ct. 1030, 1033, 22 L.Ed.2d 248 (1969).

■ In *Smith,* the Supreme Court held that the State's introduction into evidence of a court-appointed psychiatrist's testimony to prove a capital defendant's future dangerousness, based on information obtained by the psychiatrist from his interrogation of a defendant in custody who has neither requested the examination nor introduced psychiatric evidence on that issue, without a prior warning to the defendant that he has the right to remain silent and that any statement he made could be used against him at a sentencing proceeding, violated the rule adopted in *Miranda v. Arizona, supra,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. *Miranda* established a procedural rule prohibiting the state from introducing as part of its case in chief either inculpatory or exculpatory statements made by a defendant stemming from an official custodial interrogation unless that questioning had been preceded by warnings to that defendant sufficient to inform him of his privilege against self-incrimination. *Miranda v. Arizona, supra,* 384 U.S. at 444, 86 S.Ct. at 1612. *See Estelle v. Smith, supra,* —— U.S. at ——, 101 S.Ct. at 1875; *Michigan v. Tucker,* 417 U.S. 433, 443, 94 S.Ct. 2357, 2363, 41 L.Ed.2d 182 (1974). The procedural safeguards required by *Miranda* "were not themselves rights protected by the Constitution but were instead measures to insure that the right against compulsory self-incrimination was protected," *Michigan v. Tucker, supra,* 417 U.S. at 444, 94 S.Ct. at 2364, and "*Miranda* itself indicated that no talismanic incantation was required to satisfy its strictures." *California v. Prysock,* —— U.S. ——, ——, 101 S.Ct. 2806, 2809, 69 L.Ed.2d 696 (1981). Thus, the State must both admonish a putative defendant and obtain a valid waiver of his fifth amendment privilege as prerequisites for introducing any statement made by him during the course of an official custodial interrogation.

■ The Supreme Court held in *Smith* that *Miranda* was applicable in the circumstances of that case and required the reversal of the petitioner's death sentence. The Court decided that proof of a Texas capital defendant's guilt did not, by itself, remove the protection of the privilege against self-incrimination because the State must prove a capital defendant's future dangerousness as a separate and distinct requirement for imposing a capital sentence apart from proof of that defendant's guilt. *Estelle v. Smith, supra,* —— U.S. at ——, 101 S.Ct. at 1873.[8] The Court further held that a person's communications to a psychiatrist were testimonial in nature, and therefore protected by the privilege, where a psychiatrist based his diagnosis on the "substance of [the defendant's] disclosures during the pretrial psychiatric examination." *Id.* at ——, 101 S.Ct. at 1874.[9] The Court also concluded that custodial interrogation by a court-appointed psychiatrist must be treated the same as a custodial interrogation by a police officer or prosecuting attorney for the purpose of determining the applicability of *Miranda.* *Id.* at ——, ——, 101 S.Ct. at 1875–76. Therefore, a custodial interroga-

tion performed by a court-appointed psychiatrist used to establish an element of proof necessary to support the imposition of capital punishment must be preceded by a warning sufficient to advise a capital defendant of his fifth amendment privilege where the defendant has neither requested the examination nor introduced psychiatric evidence on the issue of future dangerousness. *Estelle v. Smith, supra,* —— U.S. at ——, 101 S.Ct. at 1875–76.[10]

■ The State contends that "the extension of the procedural safeguards [of *Miranda*] to psychiatric examinations, conducted by mental health professionals, who are not connected with law enforcement officials, originally conducted for neutral purposes, clearly presented an issue of first impression . . . not clearly foreshadowed by any prior cases." Second Supplemental Brief for Respondent-Appellee at 7 (footnotes omitted). But the distinctions drawn by the State between *Smith* and *Miranda* do not withstand close scrutiny. In both cases an agent of the State conducted a custodial interrogation of a defendant, as

**8.** According to the Supreme Court, "[t]he essence of this basic constitutional principle is 'the requirement that the State which proposes to convict *and punish* an individual produce the evidence against him by the independent labor of its officers, not by the simple, cruel expedient of forcing it from his own lips,'" *Estelle v. Smith, supra,* —— U.S. at ——, 101 S.Ct. at 1872, quoting *Culombe v. Connecticut,* 367 U.S. 568, 581–82, 81 S.Ct. 1860, 1867–68, 6 L.Ed.2d 1037 (1961) (emphasis added in *Smith*) and "'the availability of the privilege does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites.'" *Id.,* at ——, 101 S.Ct. at 1872–73, quoting *In re Gault,* 387 U.S. 1, 49, 87 S.Ct. 1428, 1455, 18 L.Ed.2d 527 (1967). Because the privilege, where available, protects a person from being compelled to give any statement which would "furnish a link in the chain of evidence" necessary to impose a punishment upon that person, *Hoffman v. United States,* 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1188 (1951), and because proof of a capital defendant's future dangerousness is just such a "link" which the State of Texas must prove in addition to a defendant's guilt to impose a capital sentence, *Estelle v. Smith, supra,* —— U.S. at ——, 101 S.Ct. at 1874–75, proof of

a capital defendant's guilt did not by itself remove the protection of the fifth amendment privilege.

**9.** *Smith* distinguished the State's use of a psychiatric examination to determine a defendant's competency to stand trial and the defense's use of a psychiatric examination to prove a defendant's insanity at the time of the crime from the State's use of a psychiatric examination to prove a capital defendant's future dangerousness on the ground that future dangerousness was a prerequisite that the State of Texas had to prove to impose a capital sentence. *Estelle v. Smith, supra,* —— U.S. at ——, 101 S.Ct. at 1874–75. *See* notes 10 & 21 infra.

**10.** *Smith* only held the fifth amendment privilege applicable to the sentencing stage of a capital trial in Texas because the State of Texas must prove a capital defendant's future dangerousness as an issue separate and distinct from proof of his guilt. The applicability of the privilege to mandatory or discretionary sentencing procedures not requiring proof of such an additional prerequisite to impose a criminal punishment raises different questions not necessarily resolved by *Smith.* *See* note 8 *supra* & note 21 *infra.*

those terms have been interpreted,[11] and the State thereby obtained statements from an accused which it then used as part of its case against the defendant. The only difference between the two situations is that the agent of the State who performed the custodial interrogation in *Miranda* was a police officer while the agent of the State who performed the custodial interrogation in *Smith* was a court-appointed psychiatrist. But the particular office that the official who performs the custodial interrogation represents is inconsequential because *Miranda* was not concerned with the division of responsibility between the various state investigatory agencies but was concerned with official custodial interrogations of an accused and the use of statements obtained from an accused without an attorney in such circumstances to prove the State's case against the accused.[12] The *Miranda* decision was designed to protect a putative defendant against the compulsion to incriminate himself arising from an official custodial interrogation. That compulsion can occur, however, from an interrogation conducted by a court-appointed psychiatrist as well as a police officer. The *Smith* decision merely recognized that a custodial interrogation conducted by a court-appointed psychiatrist raised the same concerns as a custodial interrogation conducted by a police officer and therefore must be preceded by the same warnings *Miranda* requires a police officer to give.[13] Therefore, while the Supreme Court had never held prior to *Smith* that *Miranda* warnings must be given to a defendant prior to a custodial interrogation performed by a court-appointed psychiatrist, the holding in *Smith* followed logically from the *Miranda* decision itself. Thus, *Smith* did not establish a new principle of federal constitutional law because that decision merely applied already fixed principles to a new factual situation. Accordingly, this holding in *Smith* must be given retroactive effect.

### B. Application of *Estelle v. Smith*

▌ Application of *Smith* to the facts of this case requires that we set aside petitioner's death sentence. At the time of Dr. Patterson's testing of petitioner he was confined at the Tarrant County Jail and so was in custody for the purpose of determining the applicability of *Miranda*.[14] Dr. Patterson's testing constituted an interrogation of petitioner as that term has been defined under *Miranda*.[15] Dr. Patterson had been appointed by the state trial court to conduct the examination and therefore the custodial interrogation was conducted by an agent of

---

11. *See* notes 14 & 15 *infra*.

12. The party conducting the custodial interrogation must have some connection with the State, however. The *Miranda* decision is not applicable to private citizens even if they conduct a "custodial interrogation" as those terms have been interpreted by the Supreme Court. *See* notes 14 & 15 *infra*. Absent some connection with the State by the person questioning a defendant, *Miranda* does not bar the State's use of statements obtained from a defendant by that person. *See* Kamisar, Brewer v. Williams, Massiah, *and* Miranda: *What is "Interrogation"? When Does It Matter*?", 67 Geo.L.J. 1, 52–55 & n. 307 (1978), cited in *Rhode Island v. Innis*, 446 U.S. 291, 300 n. 7, 100 S.Ct. 1682, 1694 n. 7, 64 L.Ed.2d 297 (1980). A court-appointed psychiatric examination involves the fifth amendment privilege, however, as Texas law itself recognizes. Tex.Code Crim.Pro. Art. 46.02(3)(g) (Vernon 1979) ("[n]o statement made by a defendant during the examination ... may be admitted in evidence against the defendant on the issue of guilt in any criminal

proceeding."), quoted in *Estelle v. Smith, supra*, —— U.S. at —— n. 6, 101 S.Ct. at 1873 n. 6.

13. No particular phraseology of these warnings is required so long as the defendant or putative defendant is informed of his rights. *California v. Prysock*, —— U.S. ——, 101 S.Ct. 2806, 69 L.Ed.2d —— (1981).

14. *See Roberts v. United States*, 445 U.S. 552, 560, 100 S.Ct. 1358, 1364–65, 63 L.Ed.2d 622 (1980); *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976); *Orozco v. Texas*, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969); *Mathis v. United States*, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968).

15. *See Rhode Island v. Innis*, 446 U.S. 291, 298–303 & nn. 3–10, 100 S.Ct. 1682, 1888–90 & nn. 3–10, 64 L.Ed.2d 297 (1980).

the state.[16] Finally, Dr. Patterson did not advise petitioner of his fifth amendment privilege, and the defense neither requested an examination on future dangerousness nor introduced psychiatric or psychological testimony on that issue. Unless there is some significant difference between this case and *Smith* petitioner's death sentence must be vacated.[17]

The State contends that this case is not controlled by *Smith* for several reasons, none of which we find persuasive. The State argues that petitioner's responses to Dr. Patterson's tests constituted real rather than testimonial evidence. However, here as in *Smith* the mental health expert who testified for the State based his analysis of petitioner's future dangerousness on the content of the responses given by the petitioner to the expert's tests.[18] Petitioner was not simply "required to use his voice as an identifying physical characteristic" but instead was required "to speak his guilt" by responding to Dr. Patterson's test questions. *United States v. Wade*, 388 U.S. 218, 222–23, 87 S.Ct. 1926, 1930, 18 L.Ed.2d 1149 (1967). *Accord United States v. Dionisio*, 410 U.S. 1, 6–7, 93 S.Ct. 764, 768, 35 L.Ed.2d 67 (1973); *Gilbert v. California*, 388 U.S.

263, 266–67, 87 S.Ct. 1951, 1953, 18 L.Ed.2d 1178 (1967). Therefore, petitioner's responses constituted testimonial evidence. *Estelle v. Smith, supra*, —— U.S. at ——, 101 S.Ct. at 1873–74.

The State also contends that petitioner waived his fifth amendment privilege by requesting a psychiatric examination to determine his competency to stand trial and his sanity at the time of the commission of the crime. This argument however confuses the use of psychiatric examinations by the defense or the State to determine a defendant's competency to stand trial with the use of a psychiatric examination by the defense or the State to ascertain the defendant's insanity at the time of the crime. Each use of psychiatric testimony raises questions different from those raised by the other and different doctrines have developed to account for these different problems.

▮ The use of a psychiatric or psychological examination to determine a defendant's competency to stand trial [19] is a separate matter as far as the fifth amendment privilege is concerned and is distinct from the use of a psychiatric or psychological examination to determine the defend-

16. See note 12 *supra*.

17. The fifth amendment question here does not turn on the fact that Battie is under a capital sentence. The text of the privilege states that "[n]o person ... shall be compelled in *any* criminal case to be a witness against himself," U.S.Const. Amend. V (emphasis added), nothing in the history of the privilege demonstrates that it was intended to afford any special protection in capital cases, see L. Levy, Origins of the Fifth Amendment (1968); McCormick's Handbook of the Law of Evidence § 114 (2d ed. 1972); 8 J. Wigmore, Evidence § 2250 (McNaughton rev. ed. 1961); McCormick, *The Scope of the Privilege in the Law of Evidence*, 16 Tex.L.Rev. 447 (1938); Morgan, *The Privilege Against Self-Incrimination in America*, 21 Va.L.Rev. 763 (1935), and none of the values the privilege is designed to protect reflect concern for the accuracy of trial results. See *Carter v. Kentucky*, 450 U.S. 288, 300 & n. 15, 101 S.Ct. 1112, 1118–1119 & n. 15, 67 L.Ed.2d 241 (1981); *Murphy v. Waterfront Comm'n*, 378 U.S. 52, 55, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678 (1964). The heightened protection that capital defendants have received has been afforded under the eighth amendment cruel and unusual punishments clause at the sentencing

stage and has not been transposed to the entire federal constitution in a domino fashion. *Cf.* Friendly, *The Bill of Rights as a Code of Criminal Procedure*, 53 Calif.L.Rev. 929, 950 (1965). For instance, in *Bullington v. Missouri*, —— U.S. ——, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981) all nine Justices agreed that the double jeopardy question presented there should be resolved by reference to the existing jurisprudence developed under that clause without resort to any special double jeopardy protection for capital defendants.

18. Dr. Patterson testified that he based his analysis on petitioner's answers to the test questions he administered to petitioner, Tr. 1230, and upon "the pertinent information that [petitioner] produce[d] in relation to the test protocol or test battery." Tr. 1244.

19. The question of a person's competency can arise at several points in the criminal process, see Note, *The Eighth Amendment and the Execution of the Presently Incompetent*, 32 Stan.L. Rev. 765, 783 n. 83 (1980), and we will use the term competency to stand trial to refer to all of these different points.

ant's culpability or responsibility for the crimes charged against him. The State's use of the results of a competency examination does not infringe upon a defendant's fifth amendment privilege because it does not assist the State in proving any of the elements necessary to support the imposition of a criminal punishment under state law. *See Estelle v. Smith, supra,* —— U.S. at —— —— ——, 101 S.Ct. at 1874–75.[20] Had Dr. Patterson's examination been used only to determine petitioner's competency to stand trial "no Fifth Amendment issue would have arisen." *Id.* at ——, 101 S.Ct. at 1874; *id.* at ——, 101 S.Ct. at 1876.

However, when the same type of examination is used to determine a defendant's culpability or responsibility for the crimes charged against him the fifth amendment privilege is involved because the use of a psychiatric or psychological examination in this context may assist the State in establishing the basis for imposition of a criminal punishment.[21] This use of psychiatric or psychological testimony can arise in a variety of situations. One such situation was present in *Smith.* There the State used the results from a court-ap-

pointed psychiatric examination of a defendant who neither requested the examination nor introduced psychiatric testimony himself in order to prove an essential element under state law for imposing a criminal punishment. In that situation, the Supreme Court held that the defendant is entitled to the protection of the fifth amendment and also that a court-appointed psychiatrist must inform that defendant of his fifth amendment rights in accordance with *Miranda* prior to any custodial interrogation in order for the State to introduce at trial the results obtained from that interrogation. A different situation was present in *United States v. Cohen,* 530 F.2d 43 (5th Cir.), *cert. denied,* 429 U.S. 855, 97 S.Ct. 149, 50 L.Ed.2d 130 (1976). In *Cohen,* the federal government used the results of a court-appointed psychiatric examination only after the defense had introduced psychiatric testimony in order to raise a mental defense. In this situation, this Court held that the introduction by the defense of psychiatric testimony constituted a waiver of the defendant's fifth amendment privilege in the same manner as would the defend-

**20.** "[E]xaminations which are restricted to a determination of a defendant's competency to stand trial cannot be said to incriminate him. A finding of incompetency is only an adjudication of status, neither incriminating nor exculpatory per se. Incompetency is not a defense to a criminal charge; it merely works a delay in the start of the trial." Berry, *Self-Incrimination and the Compulsory Mental Examination: A Proposal,* 15 Ariz.L.Rev. 919, 937 (1973) (footnotes omitted). *See* Pizzi, *Competency to Stand Trial in Federal Courts: Conceptual and Constitutional Problems,* 45 U.Chi.L.Rev. 21, 23, 37–38 (1977); note 8 *supra.*

**21.** Whether psychiatric evidence assists the State in establishing the necessary predicate for imposing criminal punishment may turn on two factors: (1) whether the State or the defendant bears the burden of proving insanity; and (2) whether proof of insanity is inconsistent with proof of the elements of the offense charged against the accused. *Cf.* notes 8 & 9, *supra.* Because the State may require the accused to bear the burden of proving insanity by a preponderance of the evidence, *Rivera v. Delaware,* 419 U.S. 877, 97 S.Ct. 226, 50 L.Ed.2d 160, *dismissing appeal for want of a substantial federal question from, Rivera v. State,* 351 A.2d 561 (Del.1976), or beyond a reasonable doubt,

*Leland v. Oregon,* 343 U.S. 790, 798–99, 72 S.Ct. 1002, 1007–08, 96 L.Ed. 1302 (1952); *see Patterson v. New York,* 432 U.S. 197, 207, 97 S.Ct. 2319, 2325, 53 L.Ed.2d 281 (1977) (reaffirming *Rivera* and *Leland*), the first question must be resolved by reference to state law defining the burden of proof on the issue of insanity. The second question is also a matter of state law because proof of insanity is not necessarily inconsistent with proof of the defendant's guilt. *See Mullaney v. Wilbur,* 421 U.S. 684, 705–06, 95 S.Ct. 1881, 1893, 44 L.Ed.2d 508 (1975) (Rehnquist, J., concurring); Arenella, *The Diminished Capacity and Diminished Responsibility Defenses: Two Children of a Doomed Marriage,* 77 Colum.L.Rev. 827, 834 (1977) ("there is no necessary connection between a judgment about the defendant's criminal responsibility and his mental capacity to entertain the state of mind required by the crime. As long as the *mens rea* element is defined in terms of the conscious mind's cognitive and affective functions, it is perfectly plausible that the defendant entertained the specific mental state but was still insane.") (footnote omitted). Therefore, the answer to this question, like the answer to the first, must be found in state law.

ant's election to testify at trial.[22] *Cohen*, like virtually every other federal and state court addressing this issue, concluded that any burden imposed on the defense by this result is justified by the State's overwhelming difficulty in responding to the defense psychiatric testimony without its own psychiatric examination of the accused and by the need to prevent fraudulent mental defenses.[23]

 The State contends however that a defendant's mere submission to a psychiatric or psychological examination constitutes a waiver of the fifth amendment privilege. But the waiver doctrine is inapplicable, as here, when the defendant does not introduce the testimony of a mental health expert on the issue of a mental state relevant to the offense or a defense raised by the evidence in the case. Accordingly, a defendant can invoke the protection of the privilege when he does not introduce mental health expert testimony. Submitting to a psychiatric or psychological examination does not itself constitute a waiver of the

fifth amendment's protection. Therefore, this ground offered by the State to distinguish the *Smith* case is untenable.

Finally, the State argues that *Smith* is distinguishable because the defense requested the psychiatric examination rather than the State and therefore the concerns prompting the Supreme Court to adopt *Miranda* are unnecessary to protect a person when he initiates the interrogation himself. While this factor is relevant once a defendant has been admonished in accordance with *Miranda* and *Smith, see Edwards v. Arizona*, — U.S. —, — – — & n. 9, 101 S.Ct. 1880, 1884–85 & n. 9, 68 L.Ed.2d 378 (1981); *id.* at — – —, 101 S.Ct. at 1887–89 (Powell, J., concurring), the fact that the defense requested the examination does not obviate the necessity for giving the *Miranda* warnings where the defense did not request such an examination on the question of future dangerousness. *Miranda* was designed to protect a putative defendant's fifth amendment privilege and thus he

---

**22.** "Once a defendant decides to testify, '[t]he interests of the other party and regard for the function of courts of justice to ascertain the truth become relevant, and prevail in the balance of considerations determining the scope and limits of the privilege against self-incrimination.'" *Jenkins v. Anderson*, 447 U.S. 231, 238, 100 S.Ct. 2124, 2129, 65 L.Ed.2d 86 (1980), quoting *Brown v. United States*, 356 U.S. 148, 156, 78 S.Ct. 622, 627, 2 L.Ed.2d 589 (1958). *Accord Crampton v. Ohio, reported sub nom., McGautha v. California*, 402 U.S. 183, 215, 91 S.Ct. 1454, 1471, 28 L.Ed.2d 711 (1971); *Fitzpatrick v. United States*, 178 U.S. 304, 314–16, 20 S.Ct. 944, 948, 44 L.Ed. 1078 (1900); *Brown v. Walker*, 161 U.S. 591, 597–98, 16 S.Ct. 644, 647, 40 L.Ed. 819 (1896). By introducing psychiatric testimony obtained by the defense from a psychiatric examination of the defendant, the defense constructively puts the defendant himself on the stand and therefore the defendant is subject to psychiatric examination by the State in the same manner.

**23.** *See, e. g., Estelle v. Smith*, — U.S. —, — —, 101 S.Ct. 1866, 1874, 68 L.Ed.2d 359 (1981) (collecting federal cases); *State v. Whitlow*, 45 N.J. 3, 210 A.2d 763 (1965); *Lee v. Erie County Court*, 27 N.Y.2d 432, 267 N.E.2d 452, 318 N.Y.S.2d 705, *cert. denied*, 404 U.S. 832, 92 S.Ct. 46, 30 L.Ed.2d 50 (1971); F. Inbau, *Self-Incrimination* 52 (1961); Aronson, *Should the Privilege Against Self-Incrimination Apply to Compelled Psychiatric Examinations*, 26 Stan.

L.Rev. 55, 71–72 (1973); Berry, *supra* note 20, 15 Ariz.L.Rev. at 920 n. 10.

There is no federal constitutional right to present an insanity defense, Note, *supra* note 19, 32 Stan.L.Rev. at 794 n. 120, and therefore this result does not burden the exercise of a constitutional right. But even if there were a federal constitutional right to present an insanity defense "the Constitution does not forbid 'every government imposed choice in the criminal process that has the effect of discouraging the exercise of constitutional rights.'" *Jenkins v. Anderson*, 447 U.S. 231, 236, 100 S.Ct. 2124, 2128, 65 L.Ed.2d 86 (1980), quoting *Chaffin v. Stynchombe*, 412 U.S. 17, 30, 93 S.Ct. 1977, 1984, 36 L.Ed.2d 714 (1973). The inquiry requires consideration of both " ' "whether compelling the election impairs to an appreciable extent any of the policies behind the rights involved," ' " *id.* at 236, 100 S.Ct. at 2128, quoting *Chaffin v. Stynchombe, supra*, 412 U.S. at 32, 93 S.Ct. at 1985, quoting in turn *Crampton v. Ohio, reported sub nom., McGautha v. California*, 402 U.S. 183, 213, 91 S.Ct. 1454, 1470, 28 L.Ed.2d 711 (1971), and "the legitimacy of the challenged governmental practice." *Id.* at 238, 100 S.Ct. at 2129. The "impairment" has been held to be no more substantial than the impairment held insubstantial in *Crampton* while the legitimacy of the State's interests is manifest.

must be given the prescribed warnings prior to official custodial interrogation. The fact that defense counsel initially requested an examination to determine the petitioner's competency and sanity does not render *Miranda* inapplicable.[24]

### III. Conclusion

For the reasons stated above, petitioner's death sentence must be set aside. The case is remanded to the district court with directions that the State of Texas determine within a reasonable time whether (1) to conduct a new sentencing proceeding, in the manner provided by state statute, or (2) to vacate petitioner's sentence and impose a sentence less than death in accordance with state law.[25]

REVERSED AND REMANDED FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION.

---

24. In post-argument brief, the State contends that we should remand this case to the district court in order to permit the State to expand the record to demonstrate that petitioner was validly warned, that petitioner waived his fifth amendment privilege, and that petitioner's responses constituted real rather than testimonial evidence. Second Supplemental Brief for Respondent-Appellee at 15–17. But even assuming that a party is otherwise entitled to supplement the record in a habeas corpus case at this late date, the State has not offered to show any specific facts that contradict the present record. Prior to the introduction of Dr. Patterson's testimony at the sentencing phase, *petitioner's trial counsel objected on the ground that petitioner had not been warned* prior to Dr. Patterson's examination. Tr. 1196. During the voir dire that followed, as well as Dr. Patterson's testimony at the penalty phase, the State did not elicit from him any testimony that he warned petitioner in accordance with *Miranda*. To the contrary, Dr. Patterson stated that to his knowledge petitioner never signed a consent or release form either prior to or subsequent to the tests Dr. Patterson administered. Tr. 1201, 1203. Dr. Patterson also testified that he based his analysis upon the answers given by petitioner to his tests. Tr. 1230, 1244. *See* note 18 *supra*.

25. *See Estelle v. Smith*, —— U.S. ——, ——, 101 S.Ct. 1866, 1878, 68 L.Ed.2d 359 (1981) ("the State is free to conduct further proceedings not inconsistent with this opinion."); *Gardner v. Florida*, 430 U.S. 349, 362, 97 S.Ct. 1197, 1207, 51 L.Ed.2d 393 (1977) (plurality opinion).